**People of the State of Illinois, Plaintiff-Appellee, v. Samuel Hill, Jr., Defendant-Appellant.**

Gen. No. 52,141.

First District, Second Division.

June 18, 1968.

Rehearing denied July 24, 1968.

John J. Crown and Joan M. McMahan, of Chicago (Raymond, Mayer, Jenner & Block, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Michael C. Zissman, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

In a jury trial, the defendant, Samuel Hill, Jr., was convicted of murder, and judgment was entered. Motions for judgment notwithstanding the verdict and for

a new trial were denied and he was sentenced to not less than fifteen nor more than twenty years in the Illinois State Penitentiary. He appeals.

This case involves a homicide, which occurred soon after a disputed theft of money from the defendant's person. The theft was allegedly committed by the decedent, Willie Brown. The evidence for the prosecution showed that Brown's death by shooting occurred on June 11, 1966, between 10:30 and 11:30 p. m., near the Sportsman's Corner Tavern in Chicago. A coroner's physician testified that he performed an autopsy and found that one bullet had entered the left thigh area and the other bullet had entered Brown's left shoulder muscle in his back (i. e., medically, the posterior aspect of the left deltoid), traversing from left to right in a forward direction and passing through the left lung, the aorta and finally passing from the right lung. Only these two wounds were found in the deceased's body. The physician testified that in his opinion Brown's death was caused by a bullet wound of the aorta.

James Ivory testified for the State that on June 11, 1966, between 10:00 and 10:30 p. m., he went to Sportsman's Corner Tavern and saw the defendant and Brown, the deceased, arguing about money. Brown had a baby in his arms at the time. Defendant uttered profanities at Brown and demanded the return of his money. Brown denied having it. He went on to state that Robert Hill, the defendant's brother, was present during this argument, as were Phyllis Bryant and Dolores Brown. Ivory went into the tavern, but returned to the street when he heard three shots. He did not see who shot whom, but when he returned to the street, he found Robert Hill lying near the side door of the tavern and Brown lying across the street. Both men had been shot. The defendant was gone. Ivory was also called by the State later in the trial as a rebuttal witness. Defense counsel objected, as Ivory had sat in the courtroom and listened

to all the testimony in violation of the court's exclusionary order, requested by the State. The objection was overruled, and Ivory was allowed to testify in rebuttal.

Dolores Brown testified for the People that at approximately 10:00 p. m. on June 11, 1966, she saw Robert Hill trying to wake the defendant, who was sleeping in his own car. His efforts were unsuccessful so he obtained some water from Sportsman's Corner Tavern and while Willie Brown lifted the defendant's head, Hill threw water in his brother's face. The defendant awoke, immediately patted his pockets, stated his money was gone and asked both his brother and Brown if they had it. Receiving a negative response, the defendant said, "Well, you ———; wait until I come back. I'll be back. One of you all is going to give me my money." Ten minutes later Miss Brown saw the defendant walk over to Willie Brown, who now was playing with a baby. The defendant asked Brown for his money. Brown said he did not have it and he continued to swing the baby up and down in his arms. Miss Brown then heard a shot and saw the baby falling from the deceased's arms. It was caught by a man standing nearby. Three shots were fired with the last one hitting Robert Hill, who was steadily walking toward the defendant at the time. Later, the police arrived and took Robert Hill to the Cook County Hospital. This witness and Miss Bryant accompanied them.

On cross-examination, Miss Brown testified that she had executed a signed, written statement at the police station, after leaving the hospital. This was done in the early morning hours following the homicide. This statement, earlier marked as People's Exhibit 6 for identification, had been delivered by the prosecution to the defense near the conclusion of Miss Brown's testimony on direct examination. The witness identified this Exhibit as her statement, but went on to state, repeatedly, that she had made other written, signed statements to the police. When defense counsel asked the prosecution

to produce these other statements, the State denied their existence, tendered its entire file to defense counsel and affirmatively stated that it was not trying to hide anything before the court. Defense counsel examined the prosecutor's file, but could find no other signed, written statements therein taken from this witness. Miss Brown admitted on cross-examination that she did not tell the truth in her signed, written statement (i. e., People's Exhibit 6 for identification). She did not mention in her statement that she was standing near the deceased, who was playing with a baby at the time of the shooting, but rather only stated therein that she heard some shooting, saw Robert Hill fall, and the defendant then ran past her.

On redirect examination, Miss Brown testified that she talked to two police officers at the hospital before going to the police station. They took notes of her conversation, but these notes were never reduced to a written statement for her signature. Miss Brown again stated that she signed more than one statement at the police station. She explained that the reason for the discrepancies in her written statement, when compared with her testimony in open court, was due to the fact that at the time of making her earlier written statement, she was the girl friend of Robert Hill, the defendant's brother. She had talked with Robert Hill at the hospital, after speaking with the police officers there. He had told her not to say anything. At the conclusion of her testimony on redirect examination, Miss Brown stated that she saw the defendant shoot Willie Brown, the deceased.

At the conclusion of her testimony on recross-examination, in which Miss Brown again admitted that she had lied in her earlier written statement, but was now telling the truth in open court, defense counsel asked that the State deliver all the additional written statements signed by this witness which might be found in the Police Department file or any other file that the prosecution might

have. In response to the court's query, Miss Brown stated that she had signed two statements, with the first one being signed in the police station. The court and counsel for both sides then retired to chambers where the prosecution stated that when Miss Brown spoke of signing two statements, she really meant carbon copies of only the one statement. The court had its doubts as to this attempted clarification and indicated its willingness to ask Miss Brown some questions in a judicial effort to clarify the ambiguity and to precisely define the place and circumstances of all her alleged written statements. Defense counsel objected to such a procedure on the grounds that such questioning by the court before the jury would prejudice the defendant. Defense counsel wanted the prosecution to ask such questions of its witness, or bring in the police officers, who could either corroborate Miss Brown's testimony concerning the number of statements she had signed, or rebut it. The trial court, in deference to defense counsel's objection, did not question Miss Brown further. Neither did the prosecution.

The State did call, as its next two witnesses, the police officers who had knowledge of the statement or statements which Miss Brown had signed. Officer Peterson testified that he investigated the shooting soon after it occurred and he interviewed Miss Brown, Miss Bryant and another woman at Cook County Hospital. No signed, written statements were taken from them at that time. He then took them to a police station, where he saw two detectives receive statements from Misses Brown and Bryant. Officer Peterson went on to testify that he personally saw their statements typed out. He identified People's Exhibit 6 for identification as the typed statement he saw Miss Brown sign in the police station. He saw her sign the original and carbon copies of this statement. On cross-examination, Officer Peterson testified that Miss Brown told him at the hospital that the

defendant shot the deceased and Robert Hill following an argument concerning money. This officer was not cross-examined on the critical issue of how many written statements Miss Brown had signed in the police station.

Detective Brown testified that he saw Miss Brown and Miss Bryant in the Cook County Hospital, but no written statements were taken of them there. Miss Brown did sign a written statement in the police station. "She only signed one statement; the original plus copies. We have to maintain about eight copies for the office files downtown and for the State's Attorney's Office." This witness was not cross-examined concerning the number of statements Miss Brown had signed, but was asked if any physical evidence was recovered from the homicide scene. He stated that the Police Department found two spent cartridges and gave them to the Crime Laboratory. On redirect-examination, Detective Brown testified that he never found a gun, either at the scene nor subsequently. The police tried to obtain the weapon used but were unsuccessful.

Phyllis Bryant testified for the State that on June 11, 1966, at approximately 10:00 or 10:30 p. m., she saw the defendant, the deceased, and Robert Hill, her fiance, standing outside the Sportsman's Corner Tavern. The deceased was not holding anything in his hands and she heard no conversation between the parties at that time. When the prosecutor sought to awaken her conscience by reading her answers to the questions posed to her before the Grand Jury, defense counsel objected on the ground that the State was seeking to impeach its own witness. In chambers, the prosecutor indicated that Miss Bryant's answers before this jury and her prior answers before the Grand Jury were contradictory, and came as a surprise to the State. The trial court then indicated it was going to call Miss Bryant as the court's witness. The prosecutor asked the court if he could ask Miss Bryant some questions out of the presence of the jury and have

her examine her statements given to the police at the hospital, in a final effort to aid the court in reaching its discretionary decision as to whether Miss Bryant should be called as the court's witness. Defense counsel objected to this procedure done out of the jury's presence but the trial court overruled the objection.

Replying to the prosecution's questioning, with the jury not being present, Miss Bryant testified that she saw nothing happen to Willie Brown on June 11, 1966. In response to further questioning by the State, Miss Bryant testified that she saw the defendant slap Brown and ask him about the defendant's money. When Brown started laughing and stated he did not have his money, the defendant shot him and also shot Robert Hill, defendant's brother. The State then asked that the jury be returned and the trial court indicated that it was not going to call Miss Bryant as the court's witness but rather, she would remain as the State's witness.

In the presence of the jury now, Miss Bryant testified that she saw the defendant shoot the deceased near Sportsman's Corner Tavern, after a conversation concerning the decedent's possession of the defendant's money. The deceased was holding a baby at the time of the shooting. She heard three shots fired. On cross-examination, she stated again that she saw the defendant shoot the deceased on the night in question. Earlier in the evening she had seen the deceased fighting with an unnamed man, knocking him down, and attempting to hit him in the head with some object. The fight was stopped but not before the deceased had pushed and argued with the peacemakers. This altercation occurred before the shooting, as when the homicide occurred, the decedent had stopped fighting and was playing with a baby.

The defendant did not testify. Four witnesses did testify for the defense, but the testimony of only two of them is material to the disposition of this appeal. The

defendant's sister, Dorothy Hughes, testified that at about 9:00 p. m. on June 11, 1966, she saw the defendant sleeping in his car, when Robert Hill and Willie Brown approached. As Brown went into the defendant's pocket and shook the defendant to see if he was awake, the defendant awoke and started to argue with Brown, the deceased, who stated that if the defendant did not like it, he should step out of the car. Mrs. Hughes stated that the defendant jumped out of his car, but when Brown backed up to fight, the defendant hurriedly returned to his car and quickly drove off. Later that evening she saw Brown fighting with his Uncle Tommy.

This latter testimony concerning the fighting was corroborated by the last defense witness, William Phillips. He was asked if he knew the decedent's general reputation in the neighborhood, but the trial court sustained the State's objection to this question. Phillips stated that at the time of the shooting, he was a block away. He saw nothing but he did hear some shots. Earlier in the evening, between 10:00 and 10:30 p. m., he heard a conversation between the deceased and his cousin, as the latter had arrived to take Brown home, but Brown refused to leave stating, "I am waiting on somebody. When he comes back, I am going to kick his behind." The witness went on to mention that the decedent had been drinking since 5:00 p. m.

On appeal, the defendant contends that the trial court committed reversible error in: (1) failing to have the State produce at the trial all the signed statements given by Miss Brown to the police; (2) allowing the State to rehearse Miss Bryant in her testimony, when the jury was absent, in order to coerce her into making statements favorable to the prosecution and unfavorable to the defendant later before the jury; (3) failing to allow the defendant to inspect the physical evidence taken from the homicide scene by the police (i. e., two spent cartridges); (4) failing to allow the defense to present evi-

394

dence concerning the deceased's reputation and character; (5) allowing James Ivory to testify for the State as a rebuttal witness, after he had violated an order of the court excluding witnesses, given on the motion of the State.

In support of his contention that the trial court committed reversible error in not requiring the State to produce all the written statements signed by Miss Brown, the defendant principally relies upon, People v. Neiman, 30 Ill2d 393, 197 NE2d 8 (1964) and People v. Wright, 30 Ill2d 519, 198 NE2d 316 (1964). However, both of these cases are distinguishable on their facts from the case at bar. In the Neiman case, the trial court issued a pretrial order that the prosecution turn over to the defense, before trial, written statements of the State's two identification witnesses, which statements were shown to exist. The prosecution did not deny the existence of these written statements, agreed to turn them over before the trial began, but did not do so. On the day of the trial, the prosecution denied their existence, and defense counsel was not given an opportunity to examine them during the trial.

In reversing and remanding, the Supreme Court stated that the trial court committed reversible error by restricting the cross-examination of the State's witnesses touching upon the existence and the contents of these written statements. It went on to state that when statements by the prosecution's witnesses are shown to exist, the State, on demand, must furnish them to defense counsel for impeachment purposes. The record in the Neiman case indicated that two of the State's witnesses at the trial corroborated the existence of the written statements, and the State itself did not deny their existence on the day the pretrial production order was entered but rather refused to comply and on the day the trial began, indicated that the written statements did not exist. In the case at bar, however, the prosecution did

not fail to cooperate with the defense in searching for Miss Brown's written statements, but rather turned over to defense counsel at the trial, its entire file. Further, in the instant case, there was no corroboration of Miss Brown's testimony that she signed more than one statement. Officer Peterson and Detective Brown testified that they saw her sign only one written statement and many carbon copies. Defense counsel did not cross-examine them on this point and did not introduce any evidence to corroborate Miss Brown's testimony that she signed more than one written statement.

The Wright case is also distinguishable. That case involved a rape conviction in a jury trial. In its opinion the Supreme Court stated the case involved a close question concerning the defendant's identification as the rapist. Hence, the trial court, even though not asked by defense counsel, should have examined the contents of the police file, which was in court pursuant to the defendant's subpoena, in order to determine if it, in fact, contained a written statement by the State's sole identification witness, the prosecutrix. In her testimony she indicated that she had given the police a signed written statement. The prosecution indicated it did not have the statement, and the trial court refused to permit defense counsel to examine the police file. The Supreme Court remanded the case with directions to examine the police file. If the trial court found these statements and they would qualify for impeachment purposes, the defendant was to receive a new trial. If no documents were found, the trial court should render such a finding of fact and enter a new final judgment of conviction.

The court in the Wright opinion stated that, undisputedly, the statement signed by the prosecutrix did at one time exist and was at one time in the State's possession. However, in the case at bar, the fact of whether or not Miss Brown executed a second, signed written statement to the police is disputed. Further, in the

Wright case, the police file was in court pursuant to the defendant's subpoena. In the instant case, no police files were in court as the defendant's pretrial motion for the production of police reports, police files, etc., had been denied. No appeal is now taken from that discretionary ruling of the trial court.

The defendant does not allege that the prosecution was guilty of bad faith in this search for the alleged other written statements. The defendant does argue that the trial court should have required the State to prove that some effort had been made to locate the other statement and should have ordered the State to produce all other statements by Dolores Brown which were in the possession, custody or control of not only the prosecution, but also any other agency of the State, such as the Chicago Police Department. The record indicates that the State cooperated in the search for the alleged missing written statements. Defense counsel foreclosed the trial court's inquiry into this area by stating that the court's asking such questions of Miss Brown, in the jury's presence, concerning the existence of her other written statements, would prejudice the defendant. In People v. Arnold, 2 Ill2d 92, 96, 116 NE2d 882, 885 (1954), the court stated:

> "The trial judge has a right to ask questions of witnesses or call other witnesses to the stand in order to ascertain the facts and elicit the truth concerning the issues at hand, even when there is a jury, providing he does so without showing any bias or prejudice. . . ."

■ We find that from this record, only one original written statement signed by Miss Brown is shown to exist.

■■ Secondly, the defendant argues that the trial court erred in allowing the prosecution to coerce Miss Bryant, when the jury was absent, resulting in her later unfavorable testimony, regarding defendant, before the

397

jury. The record is devoid of any coercion practiced by the State upon Miss Bryant. No threats or promises were made by the prosecution. Rather, the record does show that in questioning this witness out of the jury's presence, the prosecutor was expressly seeking to lay the foundation for the calling of Miss Bryant as the court's witness, thereby aiding the court in its subsequent ruling thereon. Earlier, defense counsel had objected to calling Miss Bryant as the court's witness. As was stated in People v. Moriarity, 33 Ill2d 606, 615, 213 NE2d 516, 521 (1966):

> "The practice of the court's calling a witness at the request of the prosecution in a criminal case was first enunciated in Carle v. People, 200 Ill 494, where the court approved the calling of an eyewitness to a crime for whose veracity the State's Attorney could not vouch. It was later stated in People v. Cardinelli, 297 Ill 116, that the purpose of the practice was to prevent a miscarriage of justice by having an eyewitness to a crime, for whose veracity neither party will vouch, fail to testify. . . . Further, as indicated in People v. Siciliano, 4 Ill2d 581, 590, a proper foundation must be laid for the calling of a court's witness, which would necessarily consist of the reasons why the party desiring the witness cannot vouch for his veracity, and showing that the testimony of the witness will relate to direct issues and is necessary to prevent a miscarriage of justice." (Cited cases omitted.)

■■ It is true, as the defendant contends, that the jury was completely unaware that Miss Bryant first denied seeing anything happen to Willie Brown, the deceased and then, in response to further questioning by the State's Attorney, changed her testimony to state that she had seen something happen to Willie Brown. The State cannot be blamed for this. It claimed surprise when

398

the witness became unresponsive to its questions asked of her on direct examination, giving answers which were allegedly inconsistent with her prior testimony before the Grand Jury. The prosecution was acting within its legal rights in asking the court to call Miss Bryant as the court's witness. In asking her these questions, out of the jury's presence, the State was properly laying the foundation for the court's possible later calling of her as its own witness. It would tend to mislead and confuse the jury to have it present when the foundation is laid.

As a result of this questioning, which was not coercive, Miss Bryant's conscience was awakened, and it became unnecessary to call her as the court's own witness. These proceedings, held out of the jury's presence, were proper.

■ The defendant also contends that the trial court erred in failing to allow him to inspect physical evidence, i. e., two spent cartridges found at the homicide scene. The defendant subpoenaed any and all bullets, cartridge cases, and reports relating thereto arising from the alleged murder of Willie Brown or the arrest of the defendant. Furthermore, in response to the defendant's motion for a bill of particulars, the State answered that the defendant was armed with a revolver when he committed the crime. Detective Brown testified that two spent cartridges were recovered from the homicide scene, but the police were unable to find the weapon used.

■ It was error for the State not to produce these two cartridges in response to the defendant's subpoena. Whether or not these cartridges had any evidentiary value was for the defense to decide in light of the State's answer to the defendant's bill of particulars. However, the nonproduction of these cartridges was harmless error. Detective Brown testified that he briefly saw the cartridges, but he could not tell if they came from a revolver or an automatic just by looking at the casing; that he and ballistics experts would require the weapon from which they were fired. The weapon was never

recovered in this case. This factor coupled with the competent and credible testimony of the two eyewitnesses to the offense, who named the defendant as the man who shot the deceased, leads us to the conclusion that the State's failure to produce the two cartridges recovered at the homicide scene was harmless error.

■ The defendant further contends that the trial court erred in excluding testimony concerning the deceased's reputation and character. The record indicates that defense counsel sought to introduce this factor into evidence on two separate occasions—upon cross-examination of the State's first witness, James Ivory, and upon direct examination of the defense's last witness, William Phillips. The following question was asked of Ivory on cross-examination near the outset of the trial: "Did Willie Brown ever engage in any fights at the tavern?" The trial court properly sustained the State's objection to this question as it was beyond the scope of direct examination. Further, the defense had not attempted to show that the deceased was the assailant, which is the necessary foundation for the asking of such a question. See People v. Gibson, 385 Ill 371, 52 NE2d 1008 (1944).

Later in the trial, Phyllis Bryant testified that earlier in the evening of the homicide she saw the deceased fighting with an unknown man. Dorothy Hughes, the defendant's sister, corroborated this testimony and said the unknown man was the decedent's Uncle Tommy. Furthermore, she stated that the defendant and the deceased almost came to blows earlier in the evening, but the defendant fled before any blows were struck. William Phillips testified for the defense and was asked if he knew the deceased's general reputation in the neighborhood. The trial court sustained the State's objection to this question. Later in his testimony, Phillips stated that he heard the deceased tell his cousin that he was not leaving the neighborhood, but rather he was waiting for someone and when that someone returned, the deceased

400

was going ". . . to kick his behind." Defense counsel argues that the trial court erred in restricting his examination of Phillips and preventing him from introducing testimony concerning the deceased's general reputation in the neighborhood.

 The answer to this contention is to be found in the case of People v. Adams, 25 Ill2d 568, 572, 185 NE2d 676, 678–679 (1962), where the Supreme Court stated:

"This court has repeatedly held that evidence as to the violent disposition of the decedent and prior threats or misconduct by the decedent directed towards the defendant is admissible in a prosecution of the defendant for killing the decedent where the defendant relies upon self-defense and preliminary testimony establishes an act of aggression by decedent. . . ."

Hence, the fact that the decedent engaged in a fight with his uncle would not be the proper foundation for such a question directed to Phillips as the deceased's misconduct was not directed towards the defendant. The fact that the deceased and the defendant almost came to blows earlier in the evening of the homicide and that the deceased inferentially delivered a threat to the defendant which Phillips overheard, does not allow such testimony to come into evidence either. Defense witnesses had not established by their preliminary testimony that the decedent committed an act of aggression upon the defendant. Indeed, the record contains competent evidence sustaining the opposite conclusion. The coroner's physician testified that the bullet which killed the decedent by affecting his aorta entered the deceased's posterior aspect of his left deltoid. It travelled in a forward direction and moved from left to right. Such testimony would reasonably support the inference that the deceased was shot in the back.

The two eyewitnesses, Misses Brown and Bryant, did not testify to any struggle between the defendant and the deceased for possession of a gun which could result in the deceased being shot in the back. In fact, both eyewitnesses testified that the decedent was playing with a baby when he was shot. There was no showing of aggression by the decedent directed to the defendant. Hence, the trial court was correct in excluding testimony pertaining to the victim's reputation and character.

The defendant's final contention is that the trial court erred in accepting the rebuttal testimony of James Ivory for the State, after Ivory had violated the court's order excluding all witnesses from the courtroom. This order was given pursuant to a motion made by the State. Whether or not to allow a witness to testify in rebuttal, after he has remained in the courtroom throughout the trial in violation of the court's exclusionary order, rests in the sound discretion of the trial court. Such testimony is not necessarily prejudicial. See People v. Fiorito, 413 Ill 123, 108 NE2d 455 (1952). The defendant argues that actual prejudice to him occurred when Ivory attempted to discredit, by his rebuttal testimony, the statements of two defense witnesses, Shirley Hollister and Dorothy Hughes, who had testified earlier in the trial as to what they could see through the windows of the Sportsman's Corner Tavern. We disagree. The record indicates that the defendant objected to such testimony of Ivory. The trial court sustained this objection and instructed the jury to disregard Ivory's answer. The remainder of Ivory's testimony had to do with the parking position of defendant's car during certain hours of the evening in question. This testimony was thus directed to a minor collateral point in the case, not material to the main issues. Since the defendant has not shown how he was actually prejudiced by Ivory's testimony in re-

buttal, the trial court did not clearly abuse its discretion in allowing Ivory to again testify on rebuttal.

The judgment of the trial court is affirmed.

Judgment affirmed.

BURKE, P. J. and McNAMARA, J., concur.