THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MARLENE SWIMLEY, Defendant-Appellant.

First District (4th Division)   No. 63027

Opinion filed January 12, 1978.

Louis Carbonaro, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Patrick W. O'Brien, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

Defendant, Marlene Swimley, was charged by indictment with the offense of solicitation to commit murder. (Ill. Rev. Stat. 1973, ch. 38, par. 8—1.) Specifically, defendant was accused of attempting to contract for the murder of her husband. Following a trial by jury, a verdict of guilty was returned. Defendant was sentenced to the penitentiary for a term of three to nine years.

The pertinent facts of this case, as set out at trial, need to be stated at some length:

In early November of 1973, in Schaumburg, Illinois, defendant's son by a prior marriage, Joe Enderle, age 13, visited a neighbor, Kevin Senne, age 15. Kevin was told that Joe and his mother were going to attempt to kill defendant's husband, Duane Swimley, and was asked whether he knew anyone who would do it. Both boys went to the Swimley home and, in defendant's presence, Kevin told defendant that he thought Tom Mangione could accomplish the task. Kevin had heard about Mangione from a 13-year-old neighbor and friend, John DeSpain, who was also known as John Heying. John had recently left Schaumburg and moved to California to reside with his uncle.

On November 22, Kevin spoke by telephone to John DeSpain in California and asked him for Mangione's telephone number, stating that

defendant wanted her husband killed. John did not know Mangione's number, but told Kevin to call his younger sister, Kathy DeSpain, who might know the number.

Upon calling Kathy the next day, Kevin was told that Mangione now lived in Rochester, New York, but that she didn't know his phone number. Kevin again called John DeSpain and was told that there was no possibility that John could obtain the number.

Defendant, with Kevin and her son present, telephoned the long distance information operator in Rochester, New York, but was informed that Tom Mangione had an unlisted number. A short time later, defendant again called the Rochester operator, stating that there was a death in the family and that the operator should contact Mangione to inform him that he should telephone Kevin, giving the phone number at the Swimley home.

On December 1, 1973, after receiving the message, Mangione called the number and asked for Kevin Senne. Mangione, after some conversation, on being asked if he knew someone who would commit a murder, said that this "must be some kind of a joke," and hung up. After this conversation, Kevin, Joe and defendant discussed the possibility of finding someone else to kill defendant's husband.

Subsequently, Kevin and John DeSpain, who was still in California, had another telephone conversation during which John stated that he might consider murdering Duane Swimley. On December 7, there was a flurry of phone calls between John and Kevin. John asked whether defendant could fly him and his cousin back to Chicago if he would commit the murder. He explained that he had an argument with his uncle and had run away and no longer wanted to stay in California. Kevin replied that he would try to speak with defendant, and arranged to call John back. That evening, Kevin related his conversation with John to defendant, who replied that she would try to get the airline tickets for the trip to Chicago for John and his cousin. Kevin called John back from the Swimley home, telling him that defendant would try to get the money for the tickets. John then took a bus to Sacramento, California, and, being without money for transportation, walked about 15 miles to the Sacramento airport where he hoped to pick up the tickets paid for by defendant. He called Kevin who told him to stay at the airport until arrangements were completed to make the tickets available.

After telephoning various airlines, reservations for two tickets were made under the name of M. Brown on United Airlines for Master B. Enderle and Master J. Enderle on a flight from Sacramento to Chicago. The tickets, which were to be picked up at the Sacramento airport, cost $269.25. This amount had been prepaid in cash. A call was made to John

and defendant told him the tickets could be picked up at the airport the following day.

After this telephone conversation, John became frightened. He telephoned his grandfather and returned to his grandfather's home without informing Kevin or defendant. After a period of time, defendant became agitated that John hadn't arrived and referred to a previous time that a man she had hired to kill her husband had absconded with $1200.

Meanwhile, on the following day, December 8, 1973, Rock DeSpain, John's stepfather, visited Tom Mangione in Rochester. Mangione was the boyfriend of DeSpain's daughter. DeSpain often called Mangione "the godfather." Mr. DeSpain was a manufacturers' representative for car wash equipment and had come to Rochester to assist Mangione in purchasing equipment to be installed in a gas station Mangione had purchased. Mangione told DeSpain of the telephone conversation with Kevin. DeSpain, knowing that Kevin and his son John DeSpain were friends, felt that the situation might be serious and that he himself might possibly be the intended victim. He asked Mangione to call Kevin. Mangione called but failed to reach Kevin.

About four days later, after DeSpain had left Rochester, Mangione succeeded in contacting Kevin. Mangione told Kevin that a person named "Jimmy Sunshine" would do the murder and Kevin stated that "my buddy's mother wants her husband, wants to get her husband." Mangione stated that either he or "Jimmy Sunshine" would contact Kevin. Upon telephoning Rock DeSpain, Mangione was told that DeSpain would call the Schaumburg police and notify them of these events.

Officer Terry McGraw of the Schaumburg police department was contacted by DeSpain the following day. On January 23, 1974, after making an investigation, Officer McGraw informed the State's Attorney's office that two teenagers were attempting to hire a killer, and that telephone calls which were made for this purpose emanated from the Senne and Swimley residences.

Investigator Joseph Saladino of the State's Attorney's office attempted to reach Kevin Senne without success. He first called the Senne residence but did not receive an answer. Telephoning the Swimley residence, a male answered the phone. Saladino asked for Kevin Senne but did not speak with him. Saladino said that he was Jimmy Sunshine and would meet the person's mother at the Woodfield Mall Plaza parking lot near the theatre at 11 a.m. the next day.

The next morning, January 24, 1974, Saladino went to his office at 26th and California in Chicago and obtained authorization to use eavesdropping equipment. Saladino was outfitted with a transmitter and tape recorder, both of which were taped to his body under his shirt. He

and four others from his office proceeded to Schaumburg to meet with the Schaumburg police.

After this meeting, Saladino proceeded alone in an unmarked vehicle to the Woodfield Mall parking lot, arriving shortly before 11 a.m. He parked near the theatre and saw a Sears truck parked approximately 75 yards away. The truck actually belonged to the Schaumburg Police Department and contained video tape equipment.

Within several minutes, Saladino saw a blue-black Lincoln Continental drive into the lot and park nearby. Saladino noted that the license plate number, 147347, was the same that he had been told to watch for. Defendant left the Continental and entered Saladino's car, seating herself on the front passenger's seat. The following conversation occurred:

"JOSEPH SALADINO: I understand that you want to see me.

MARLENE SWIMLEY: Yeah, You're a friend of Tom Mangione's right. Ah, my oldest one talked to Tom, and ah you said something about it could be done over there.

JOSEPH SALADINO: It can be arranged. What is it—exactly do you want, you know, what's, who is it. What's it about?

MARLENE SWIMLEY: Well, it's my husband.

JOSEPH SALADINO: And?

MARLENE SWIMLEY: What do you mean?

JOSEPH SALADINO: All I got, was I was supposed to contact you. In relation to what? But what is it? You want him what?

MARLENE SWIMLEY: You know, kind of evaporated.

JOSEPH SALADINO: What do you mean? What do you mean evaporated?

MARLENE SWIMLEY: Well, you know, gone.

JOSEPH SALADINO: Do You mean murder?

MARLENE SWIMLEY: Yeah.

JOSEPH SALADINO: You got a picture of him, identification?"

Defendant then handed Saladino two photographs of her husband, who was in the Air Force Reserve on duty in Germany but would be returning February 3. Defendant indicated that she would pay $5000 for the assassination. Saladino asked for a down payment, and defendant stated that she didn't want to give him too much since she had once paid $2,500 to a friend in Detroit to have Mr. Swimley killed and she never again heard from the man who was to accomplish the murder. Defendant agreed to pay $500 and asked if the slaying could be done in Germany. Defendant said Saladino could use the name of a friend of Mr. Swimley who sold paintings and guns, Hans Hagenaw, to lure him off the base, and that she didn't care so long as it was done quickly. Saladino asked why she wanted him killed and defendant replied that her husband was a "mean bastard." Defendant told Saladino that her husband would soon be worth

about $500,000. Defendant stated that the only persons who knew of the plan were her son and Kevin.

Defendant wrote Mr. Swimley's address on the back of the photograph of her husband that she had shown and given to Saladino. Defendant gave Saladino two $50 bills and agreed to pay $400 the following day. Thereupon, defendant was placed under arrest and taken into custody by the Schaumburg police.

After the State had rested its case, defendant testified on her own behalf and denied any involvement in planning her husband's murder. She stated that she first heard of the plan on the evening of January 23, 1974. While preparing dinner, Kevin came into the kitchen and told her that arrangements had been made to murder her husband and that she was to meet a man at Woodfield Mall at 11 a.m. the next morning and bring $1,500. Defendant, surprised, asked Kevin why he would do this. Kevin replied: "Well aren't you tired of getting beaten up all of the time."

Defendant responded that she and her husband would work out their problems alone. Kevin said he couldn't call the arranged meeting off because he didn't know where to call the man. Kevin became upset and stated that he was afraid that the man would do something to him if defendant didn't go. Defendant replied that she would try to think of something.

Defendant went to the Woodfield Mall at the arranged time not thinking anyone would be there to meet her. In case someone did appear, she asserted that she had brought along a 10-year-old photograph of her husband, taken of him in his military uniform and with the thought that perhaps a military uniform would be a deterrent to anyone involved in accomplishing her husband's death. Also, defendant testified that she did not believe her husband could be recognized from the old photograph. She asserted that she further discouraged the person she met by not taking any money with her, insisting on several days prior notice of the killing, telling him that she couldn't get money for a long time, insisting the act be done in Germany, and merely giving him the address of the air base. Defendant further stated that she never intended to kill her husband nor did she know how much money was in her purse when she left for the rendezvous. Defendant stated that she did not believe Saladino was actually a hit man.

Defendant further stated that her maiden name had been Molly Brown but denied receiving a check sent to Molly Brown in care of "Joan Danny." Defendant denied knowing John DeSpain or making airline reservations for Master B. Enderle and Master J. Enderle, or writing a letter requesting a refund, or receiving mail under her maiden name at the home of a friend, Joan Danz. She further denied that several years before, she had pointed a gun at her husband and that it had misfired.

Defendant admitted knowing an old family friend named Hal Blaauw, but denied that he was her boyfriend. Although Blaauw took a trip to Florida with defendant and her children, defendant stated that this was done at her husband's request, as were occasions when Blaauw took defendant out alone.

Defendant denied attempting to obtain a $100,000 insurance policy on her husband's life. She stated that an insurance salesman, Mr. Brazelton, had inquired about insurance. Defendant had responded that she would have to talk to her husband, but gave him information pertaining to her husband and a check for $60. The check was returned when Brazelton spoke with Mr. Swimley.

Defendant also stated that she knew Hans Hagenaw and that he had helped her husband purchase oil paintings in Germany.

In rebuttal, a sheriff's policewoman and an assistant state's attorney testified that defendant had stated, after her arrest, that she had attempted to hire someone to kill her husband because he had beaten her.

The first contention to be considered is defendant's claim that authorization to eavesdrop and electronically record the conversation between defendant and Saladino was not properly given by the State's Attorney and thus the recorded conversation was inadmissible in evidence and should have been excluded. Defendant claims that since there was no showing that State's Attorney Carey was outside of the jurisdiction and unavailable, the consent to eavesdrop and record given by First Assistant State's Attorney Haddad was not legally sufficient. This argument is premised upon the assertion that since the eavesdropping statute (Ill. Rev. Stat. 1973, ch. 38, par. 14—2(a)) makes provision only for authorization by the State's Attorney, assistants are precluded from giving proper consents.

■■ Initially, it must be noted that eavesdropping with the consent of one party does not violate the Fourth Amendment to the United States Constitution. (*United States v. White* (1971), 401 U.S. 28 L. Ed. 453, 91 S. Ct. 1122.) Thus, the constraints placed on one party consent eavesdropping are statutory. *People v. Richardson* (1975), 60 Ill. 2d 189, 328 N.E.2d 260.

In the present case, at the hearing on the motion to suppress, the evidence disclosed that the State's Attorney's office did not have any knowledge of the case until the afternoon of January 23, 1974. A memorandum requesting authority for electronic surveillance was received by assistant state's attorney Gillis the next day at 8:45 a.m. Unable to contact State's Attorney Carey, who was in traffic on the way to a meeting, Gillis obtained the authorization of the first assistant.

In *People v. Nahas* (1973), 9 Ill. App. 3d 570, 575-76, 292 N.E.2d 466, 470, a similar issue arose concerning the authorization given by the first

assistant state's attorney when the State's Attorney was unavailable. The court stated:

> "An Assistant State's Attorney is generally clothed with all the powers and privileges of the State's Attorney; and all acts done by him in that capacity must be regarded as if done by the State's Attorney himself. 27 C.J.S. District and Pros. Attys. Sec. 30(1).
>
> In *People v. T., St. L. & W. R.R. Co.*, 267 Ill. 142, our Supreme Court concluded that Assistant State's Attorneys were 'officers for the performance of the general duties of the offices of State's Attorney* * *'. We believe that the legislative purpose in creating the office of Assistant State's Attorney (Sec. 18, ch. 53, Ill. Rev. Stat.), was to provide an official who should have full power to act in the case of the absence or sickness of the State's Attorney, or in the case of his being otherwise engaged in the discharge of the duties of office, in the same manner and to the same extent that the State's Attorney could act, and we also believe that the General Assembly in using the term, 'a State's Attorney' did intend that an assistant could act. Compare *People v. White*, 24 Ill. App. 2d 324, 80 A.L.R.2d 1060."

■■ We conclude that the authorization was properly granted. While it has been held that any assistant state's attorney may grant authorization (the second district in *People v. Holliman* (1974), 22 Ill. App. 3d 95, 316 N.E.2d 812), because of the facts of this case, we do not need to decide whether the legislature intended to grant such broad authority.

■■ Defendant also claims that the request to eavesdrop and record was based on false information. The request stated that Saladino had spoken to Joe Enderle in arranging the meeting. Saladino later stated that he did not know to whom he had spoken. However, this does not render the information in the request false. Although Saladino did not know, assistant state's attorney Sklarsky, who made the request, testified that Officer McGraw informed him of Enderle's identity. Thus, there was no showing by defendant that the report was false.

It should also be noted that the eavesdropping statute, at the time that the request was made that the conversation be recorded, was silent as to what, if any, information might be required before a State's Attorney may make his request. In *People v. Richardson* (1975), 60 Ill. 2d 189, 195, 328 N.E.2d 260, 264, our supreme court held that specific standards are not necessary.

> "It must be borne in mind, however, that the statute has not diminished the defendant's rights but has in fact increased the protection of his rights. Under the *White* decision, in the absence of the eavesdropping statute, one party consent conversations could be recorded solely upon the decision of the police

department. Section 14—2 has added the requirement that there must be, in addition to the consent of one of the parties to a conversation, a request from the State's Attorney before recording of the conversation is permitted. The statute's failure to enumerate requirements in addition to the consent of one party does not violate the fourteenth amendment. The office of the State's Attorney has historically 'involved the exercise of a large measure of discretion in the many areas in which State's Attorneys must act in the performance of their duties in the administration of justice.' (*People v. Handley* (1972), 51 Ill. 2d 229, 233.) It does not violate due process to leave with the State's Attorney the decision whether or not to record conversations with the consent of one of the parties to them."

■■ Although the statute has been amended to require judicial approval for the use of an eavesdropping device (Ill. Rev. Stat. 1976 Supp., ch. 38, pars. 14—2, 108A—1), the State's Attorney enjoyed the privilege of solely determining when to use such a device at the time the conversation in the instant case occurred. *Richardson* was the state of the law at that time and we will not retroactively apply a greater standard.

Defendant further contends that the trial court improperly denied her motion to prevent abuse of the grand jury process. This motion was filed in an attempt by the defense to suppress evidence obtained by virtue of grand jury subpoenas issued during the course of an investigation of Hal Blaauw. Blaauw was named as a possible co-conspirator in the State's amended bill of particulars.

■■ "In the absence of any showing to the contrary, the presumption will be indulged that the investigation by the grand jury was one that it had the right and power to conduct." (*People v. Polk* (1961), 21 Ill. 2d 594, 598, 174 N.E.2d 393, 395.) The representation made by the State to the trial court, that Blaauw may have been a co-conspirator to the offense, was sufficient to establish that the grand jury process was proper. Consequently, any evidence obtained as a result of a bona fide inquiry into the criminal conduct of Blaauw could be used in a pending proceeding such as the present case. See *United States v. Sellaro* (8th Cir. 1973), 514 F.2d 114.

Next, defendant contends that it was error for the State to fail to correct the false testimony of John DeSpain. On cross-examination, John DeSpain stated that no one had discussed immunity with him. Defense counsel then stated that he had been informed that immunity may have been discussed. The State's objection to this statement was sustained. Defense counsel then proceeded to other areas of cross-examination. Nothing further pertaining to any discussion of immunity was developed at trial or raised in a rather lengthy and detailed post-trial motion.

■■ While defendant did not specifically raise the question of DeSpain's immunity in his post-trial motion, an allegation did state that the court "erred in repeatedly and unduly restricting the defendant's right to properly and adequately cross-examine and impeach State's witnesses." We believe that the ordinary rules regarding waiver should be relaxed under the circumstances of this case. See *People v. Lott* (1975), 33 Ill. App. 3d 779, 338 N.E.2d 434, *affirmed* (1977), 66 Ill. 2d 290, 362 N.E.2d 312.

■■ Upon consideration of the point on the merits, it must be concluded that defendant failed to present evidence which would establish that DeSpain answered falsely when asked if immunity had been discussed. In *Napue v. Illinois* (1959), 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173, the Supreme Court held that the failure of the prosecutor to correct the testimony of a witness which was known to be false constituted a denial of due process of law. However, in that case, as in other cases cited by defendant, the false testimony was established in the record. (*People v. McKinney* (1964), 31 Ill. 2d 246, 201 N.E. 431; *People v. Lueck* (1962), 24 Ill. 2d 554, 182 N.E.2d 733.) In the present case, there is nothing in the record to indicate that the testimony was false. Defense counsel's statement that immunity *may* have been discussed is not the kind of evidence which would establish perjury. Defense counsel, if he knew that DeSpain's assertion was false, could have presented competent evidence to establish that point. There was no evidence to substantiate the defendant's speculation that the witness testified falsely when he said that there was no discussion about immunity. Since the defense failed completely to indicate that DeSpain was not telling the truth, there is no showing of any improper conduct by the State. *People v. Harris* (1973), 55 Ill. 2d 15, 302 N.E.2d 1.

Defendant raises the contention that it was improper to allow cross-examination of defendant and the admission of rebuttal testimony on the question of whether defendant had pointed a loaded gun at defendant and pulled the trigger.

During her testimony, defendant stated that she never intended to kill her husband. On cross-examination, she denied that she had pointed a gun at Mr. Swimley and that it had misfired. On rebuttal, Swimley testified that in October 1972, defendant had pointed a gun at him and pulled the trigger, but the weapon did not fire.

■■ It is apparent that the question of intent was very much in issue in this case. The rule of evidence which precludes the introduction of evidence concerning offenses other than that for which an accused is being tried is fundamental to a fair trial. (*People v. Manzella* (1974), 56 Ill. 2d 187, 306 N.E.2d 16.) However, "[e]vidence which tends to prove a fact in issue is admissible even though it discloses that the defendant

committed another crime, and evidence which establishes motive, intent, identity, accident or absence of mistake is admissible even though it may also involve proof of a separate offense." (*People v. Dewey* (1969), 42 Ill. 2d 148, 157, 246 N.E.2d 232, 236.) The questions asked of defendant in cross-examination and the evidence in rebuttal were proper since it tended to prove defendant's intent. Although the incident occurred in October 1972, it was not too remote in time. See *People v. Griswold* (1950), 405 Ill. 53, 92 N.E.2d 91.

Defendant also contends that the trial court abused its discretion in refusing to exclude Duane Swimley from the courtroom. Further defendant claims that it was error not to allow the defense to call him as a hostile witness.

At the beginning of trial, the court excluded all witnesses except for Swimley. This exception was based upon the representation of the State that he would not be called as a witness during its case-in-chief and that he might not need to be called in rebuttal. Swimley's name was not on the list of witnesses. During the defendant's case-in-chief, defense counsel asked that Swimley be called as a hostile witness or as the court's witness. The reason given by defense counsel for the motion was that:

> "He has been here every day, and they have asked my client whether or not she tried to kill him, whether or not Hal Blaauw was a boyfriend, many questions, your Honor. I wish I could go through each and every one with you to show you that he is definitely a hostile witness. He has come into court every day. He has talked to every witness of the state who has got on the stand. If that isn't a hostile witness, I don't know what it is."

The court rejected the motion and defendant chose not to call Swimley as a witness.

■■ Initially, we note that it is within the discretion of the trial court to permit a witness to remain in the courtroom. (*People v. Leemon* (1977), 66 Ill. 2d 170, 361 N.E.2d 573.) Since neither side in the present case indicated that Swimley would be called except in rebuttal, we do not think that there was an abuse of discretion. The State represented that the witness might not be called at all. However, during her testimony, defendant denied that she had pointed or attempted to fire a gun at Swimley. In rebuttal, the State called Swimley. The State's questions to him were directed solely to whether such an incident had indeed occurred. He testified that defendant had attempted to shoot him with a loaded gun. Under these circumstances it cannot be found that there was an abuse of discretion. See *People v. Miller* (1964), 30 Ill. 2d 110, 195 N.E.2d 694; *People v. Hill* (1968), 97 Ill. App. 2d 385, 240 N.E.2d 373.

Concerning the court's refusal to allow Swimley to be called as a hostile

witness, Supreme Court Rule 238 (Ill. Rev. Stat. 1973, ch. 110A, par. 238) provides:

> "If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination. The party calling an occurrence witness, upon the showing that he called the witness in good faith and is surprised by his testimony, may impeach the witness by proof of prior inconsistent statements."

The propriety of utilizing such a procedure rests largely within the discretion of the trial court. (*People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7.) Testimony which may be unfavorable to the accused is not per se hostile. *People v. Shanklin* (1975), 26 Ill. App. 3d 167, 324 N.E.2d 711.

■■ In the present case, the defense merely asserted that the witness was hostile because he had been in court throughout the proceedings and had spoken with other witnesses. At one point, the trial court suggested that defense counsel call Swimley as a witness to determine if his manner would be evasive or hostile, but this proposal was rejected. In light of this, the trial court did not abuse its discretion. For the same reasons, it was proper to refuse to call Swimley as the court's witness. See *People v. Collins* (1962), 25 Ill. 2d 605, 186 N.E.2d 30.

■■ Defendant further contends that it was error for the State to suggest that her motive for wanting her husband dead was because she had a lover and she also looked forward to a financial gain from the death of her husband. In closing argument, the prosecutor made the statement that Blaauw outranked Swimley in defendant's heart. A review of the testimony discloses that the evidence could support an inference that Blaauw and defendant were more than merely friends, having seen each other socially and having taken a vacation together. The test in such a case is "whether the argument complained of is based upon relevant evidence in the record or legitimate inferences deducible therefrom." (*People v. Wright* (1974), 56 Ill. 2d 523, 531, 309 N.E.2d 537, 541.) Under the facts of this case, the argument was not improper.

Furthermore, the testimony indicated that defendant had attempted to procure an insurance policy on her husband's life and had written a check for that purpose. Therefore, the statements made to the jury were supported by evidence in the record. (See *People v. Vasquez* (1972), 8 Ill. App. 3d 679, 291 N.E.2d 5.) Similarly, the evidence supported the inference that defendant had once paid a man to kill her husband.

■■ Defendant next contends that a tendered instruction on the subject of entrapment should have been submitted to the jury. At trial, defendant denied that she possessed the intent to solicit Saladino to murder her husband. In view of this denial that she lacked the requisite

mental state for the offense charged, the defense of entrapment was incompatible and therefore not available to her. *People v. Calcaterra* (1965), 33 Ill. 2d 541, 213 N.E.2d 270, *appeal dismissed* (1966), 385 U.S. 7, 17 L. Ed. 2d 8, 87 S. Ct. 65.

Defendant also contends that it was error not to give defendant's requested jury instructions on accomplice testimony and testimony given in exchange for immunity. Regarding the requested instruction concerning accomplice testimony, defendant submitted an instruction which did not conform to Illinois Pattern Jury Instructions, Criminal, No. 3.17 (1968). While defendant concedes that Supreme Court Rule 451 (Ill. Rev. Stat. 1973, ch. 110A, par. 451) does not require the trial court to give a non-IPI instruction, defendant maintains that the court should have given the correct instruction *sua sponte.* Pertaining to the requested instruction concerning testimony given in exchange for immunity, the trial court refused the instruction. There is no IPI instruction which refers to immunized witnesses.

A party who desires a specific instruction must offer it. The trial court has no obligation to instruct on its own motion. (*People v. Nuccio* (1973), 54 Ill. 2d 39, 294 N.E.2d 276.) This rule has been modified in criminal cases. A court bears the burden of seeing that a jury is instructed on the elements of the crime charged, on the presumption of innocence, and on the question of burden of proof. (*People v. French* (1972), 5 Ill. App. 3d 908, 284 N.E.2d 481.) In *People v. Parks* (1976), 65 Ill. 2d 132, 138, 357 N.E.2d 487, 489-90, the supreme court dealt with a similar problem. After an examination of the record, the court concluded:

> "In the case at bar, however, viewing the defendant's trial as a whole, it is clear that the jury was not deprived, by the failure to give the accomplice instruction, of essential guidance in its evaluation of the evidence. During the course of his testimony, Hooper admitted prior inconsistent statements under oath. He was sharply cross-examined both on this point and on the possibility of bias as a result of the charges still pending against him and his plea bargain with the State. Although the jury was not instructed specifically that the credibility of an accomplice was subject to suspicion, it was instructed on its duty to judge the credibility of witnesses generally and on the proper consideration of prior inconsistent statements of a witness. Although these general instructions were not as absolute an admonition as the more particularized accomplice instruction would have been, nonetheless, they provided the jury with sufficient direction. See *United States v. Johnson* (7th Cir. 1968), 398 F.2d 29; Annot., *Necessity of, and Prejudicial Effect of Omitting, Cautionary Instructions to Jury as to Accomplice's Testimony Against*

*Defendant in Federal Criminal Trial,* 17 A.L.R. Fed. 249, 315 (1973)."

■■ As in *Parks,* Kevin Senne was cross-examined extensively about prior inconsistent statements and being granted immunity from prosecution. John DeSpain's testimony revealed his agreement to kill Duane Swimley and support payments which were made by the State for his care and expenses while in California. Also, instructions on the credibility of witnesses and on prior inconsistent statements of witnesses were given. After carefully examining the record, we conclude that the failure to give defendant's tendered instructions did not constitute error in this case.

■■ Furthermore, it must be borne in mind that the testimony of these and other witnesses served to explain the circumstances which led to defendant's meeting with Saladino. The central issue in this case was defendant's meaning and intent during this conversation. The meaning was so clear that the jury, without more, could have based its conviction upon Saladino's testimony and the tape recording and transcript of the conversation that occurred in the shopping center parking lot. Although defendant has raised the contention that the facts were insufficient to prove defendant guilty beyond a reasonable doubt, we must strongly disagree. The only testimony which contradicted the evidence of guilt was that of defendant. Her rendition of what occurred was palpably inconsistent with all of the circumstances proved. It is difficult to conceive that defendant would not intend to have her husband killed while at the same time giving money and information as to his whereabouts to someone representing to be a killer for hire. The transcript of the conversation belies her claim of innocence. The jury was well justified in disbelieving defendant's version and finding that the evidence supports a verdict of guilty.

For the foregoing reasons, the judgment is affirmed.

Judgment affirmed.

DIERINGER and ROMITI, JJ., concur.