THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOSEPH GANCI, Defendant-Appellant.

First District (2nd Division)   No. 76-1041

Opinion filed January 31, 1978.

James Doherty, Public Defender, of Chicago (Andrew J. Kleczek and Leonard V. Solomon, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Kenneth T. McCurry, and Patrick J. Jennings, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendant, Joseph Ganci, was charged by indictment with the offenses of murder, attempt murder and conspiracy to commit murder in connection with the shootings of David Wright and Anthony Hernandez. (Ill. Rev. Stat. 1973, ch. 38, pars. 8—2, 8—4, 9—1.) Upon a bench trial defendant was found to be guilty as charged. Judgment was entered on the verdicts with respect to the charges of murder and attempt murder. Defendant was sentenced to serve concurrent terms of confinement in the Illinois State Penitentiary of 33 to 100 years and 11 to 33 years respectively.

From entry of the judgments of conviction defendant appeals contending: (1) that the trial court improperly denied defendant's motion for substitution of judges; and, (2) that the trial court abused its discretion in limiting the scope of defendant's cross-examination and in unduly extending the scope of the prosecution's cross-examination of certain defense witnesses.

A review of the evidence adduced at trial reveals that in the late afternoon hours of June 8, 1974, David Wright and Anthony Hernandez were struck by gunfire as they walked together near the intersection of Devon and Lakewood Avenues in Chicago, Illinois. The gunman, Joseph Ganci, approached the pair and discharged four rounds from a pump-action sawed-off shotgun into their bodies from point-blank range. Two of the rounds were fired as Wright and Hernandez lay prostrate in the street. Wright's wounds proved to be mortal. Ganci fled the United States, repaired to the Bahamas and was arrested upon his return to the United States.

At trial, Hernandez testified that on the afternoon in question, he and Wright had lunch together and visited the "R" Lounge, located at Clark Street and Devon Avenue, for approximately 1½ hours during which time each consumed several alcoholic beverages. Hernandez indicated that neither he nor Wright were armed although the latter carried a brown brief case. According to Hernandez, as they approached the intersection of Lakewood and Devon Avenues a brown Thunderbird automobile driven by one Gary Kellas drew up so as to block the walkway. Joseph Ganci exited the vehicle, drew a sawed-off shotgun, pointed it at Hernandez and ordered him into the car. Hernandez testified that he

raised his hands above his body while stepping backward and away from Ganci. Ganci stepped forward and discharged his shotgun. Hernandez testified that he and Ganci were involved in a fist-fight one week prior to the shooting during which Ganci knocked Hernandez unconscious.

During its case-in-chief the State adduced the testimony of five occurrence witnesses who were in the immediate vicinity at the time of the shooting.

Mary Grob testified that she observed two men, one of whom carried a brief case, approach the intersection in question; that another man, identified as defendant, appeared at the corner wielding a gun; that the two men faced defendant, begged him not to shoot, and backed into the intersection; and, that during the confrontation both men had their "hands up." According to Grob, one of the men dropped his brief case and was shot. Shortly thereafter, his companion was wounded and defendant proceeded to fire additional shots into his prostrate victims. This description of the occurrence was substantially corroborated by the testimony of other bystanders including Lorraine Howard, Elaine Geiser, O. D. Mason and Charles W. Dietrich. Four expended shell casings were recovered from the scene by police department personnel as well as an opened brown brief case found to contain only Wright's personal effects.

The deceased's wife testified that her husband often had occasion to carry a brief case in connection with his employment. Post-mortem examination of Wright's body established that he had suffered two shotgun wounds; that both shots were fired from a distance of approximately two feet; and, that at the time the shots were fired, Wright's left arm and head were "flexed" in such a manner that his hand was cocked toward his head.

The State also adduced the testimony of Agent Gerard Forrester of the Federal Bureau of Investigation. Forrester effected defendant's arrest in Miami, Florida, and thereafter interrogated defendant concerning the events of June 8, 1974. According to Forrester, defendant informed him that prior to the shootings defendant had been in the vicinity of the "R" Lounge when an unidentified female acquaintance emerged from the tavern and advised defendant that two individuals were in the bar with "pieces" (i.e., a pistol and a sawed-off shotgun concealed in a suitcase). Ganci allegedly stated that he thereafter observed Hernandez approaching with a shotgun; that defendant disarmed Hernandez, seized the weapon and ordered the pair to "freeze"; that the pair separated and moved as if reaching for weapons. Defendant stated that he feared for his life, began shooting the weapon and became so "frightened" that he continued to fire after Wright and Hernandez had been incapacitated. Forrester testified that Ganci made no mention of a brief case being in possession of either Wright or Hernandez. According to Forrester, Ganci

also informed him that at the time of his arrest Ganci had intended to return to Chicago to "say good-bye to his old lady" and then "lay low in a small town."

At trial, defendant testified in his own behalf and substantially denied making the statements attributed to him by Forrester. Defendant indicated that on the afternoon in question he received a telephone call from one Janet Wagner who informed him that two men, one of whom was Hernandez, were looking for him at the "R" Lounge and that Hernandez was threatening to kill him to revenge the previous altercation. According to defendant, another individual identified as John Kristovich, made a similar report to defendant and further stated that one Danny Marzano had observed what Marzano believed to be the barrel of a shotgun concealed inside a suitcase carried by Wright. Neither Kristovich nor Marzano testified at trial.

Defendant testified that he then obtained a sawed-off shotgun and, in the company of James Oldham and Gary Kellas, drove to the "R" Lounge in order to find Hernandez and "clear up" the matter. Ganci testified that he observed Hernandez and his companion walking in the vicinity of Lakewood and Devon Avenues. Ganci did not recognize the individual identified as David Wright. Ganci stated that he asked Hernandez if he was looking for him but that Hernandez continued to walk. Thereafter, according to defendant, Hernandez approached the car in which defendant was seated and threatened to "blow [defendant] away." Defendant lifted his shotgun and ordered the pair to "freeze." As defendant exited the vehicle the two men backed away and made what defendant asserted were suspicious moves toward their belts and the suitcase. Defendant testified that he feared the suitcase contained a weapon, that he fired his shotgun in self-defense and continued to fire because he was frightened. Defendant admitted that he fled the scene after the shootings.

Defendant also adduced the testimony of Nicholas Nyznyk. Nyznyk testified that he was tending bar on the occasion in question and that John Kristovich, Janet Wagner, Danny Marzano, Anthony Hernandez and his friend were amongst the patrons in the bar on that afternoon. Nyznyk stated that he heard Hernandez ask for defendant and threaten to "get even" with defendant. Janet Wagner testified that she telephoned defendant after she had spoken to John Kristovich and relayed Hernandez' threats against defendant's life.

Initially, defendant contends that it was error for the trial court to deny defendant's motion for substitution of judges without a hearing pursuant to section 114—5 of the Illinois Code of Criminal Procedure. (Ill. Rev. Stat. 1973, ch. 38, par. 114—5.) The relevant statutory provision appears as follows:

* * *

"(c) * * * [A]ny defendant may move at any time for substitution of judge for cause, supported by affidavit. Upon the filing of such motion the court shall conduct a hearing and determine the merits of the motion."

■■ While it is true that a motion for substitution of judges is to receive liberal rather than strict construction (*People v. Harston* (1974), 23 Ill. App. 3d 279, 319 N.E.2d 69), a defendant must comply with the statutory provisions for the motion and must file it at the earliest practicable moment. (*People v. Breitweiser* (1976), 38 Ill. App. 3d 1066, 349 N.E.2d 454.) Defendant must show cause and his motion must be supported by affidavit. *People v. Van Pelt* (1974), 18 Ill. App. 3d 1087, 311 N.E.2d 184.

In the instant case, defendant failed to comply with these statutory and common law prerequisites. Defendant's "motion" was oral. The record is void of any evidence, either by way of affidavit or testimony, that defendant could not receive a fair trial before Judge Hechinger. Although defendant was represented by privately retained counsel, no continuance was requested in order to permit defendant to file the necessary documents.

■■■ Further, we note that defendant's case had been on the court's calendar for a period of approximately 1½ years prior to defendant's untimely attempt to substitute judges on the date the matter had been set for trial. During the pendancy of defendant's case the trial court had denied defendant's motion to quash his arrest and suppress certain statements made pursuant thereto. The court's ruling on these substantive matters served to render defendant's subsequent motion untimely. (*People v. Johnson* (1974), 24 Ill. App. 3d 152, 320 N.E.2d 69.) Within this context, defendant contends that he became aware of the trial court's alleged prejudice only during the course of defendant's motion for substitution of judges when the court failed to express his impartiality to defendant's satisfaction. Apparently, defendant was also charged with an unrelated offense and the latter charge was pending on Judge Hechinger's calendar during the time in which the instant matter was set for trial. Our review of the record fails to establish that the trial court expressed prejudice against defendant. The burden rests not upon the court to justify retention of each case it is about to hear, but rests upon the defendant to offer evidence that prejudice will result if his motion for substitution of judges is not granted. (*People v. Breitweiser.*) Defendant has failed to do so in the instant case.

Defendant also contends that the trial court erred in refusing to permit defendant to cross-examine certain prosecution witnesses with regard to matters allegedly affecting their credibility and that such limitations

*served to deprive defendant of a fair trial. We note at the outset that the* scope and extent of cross-examination rests largely within the discretion of the trial court and only in the case of a clear abuse of discretion, resulting in manifest prejudice to the complaining party, will a reviewing court interfere with the trial court's ruling. *People v. Moss* (1977), 54 Ill. App. 3d 769, 370 N.E.2d 89.

Within this context, defendant asserts that the trial court unduly precluded defendant from inquiring about Anthony Hernandez' alleged use of or addiction to heroin at the time of the shooting.

During direct examination, Hernandez testified that in 1969 he had been convicted of the possession of a controlled substance and that he thereafter received methadone treatment for a period of several years. Hernandez stated that he had been undergoing the process of "detoxification" at the time of the shooting but that methadone had been prescribed during the course of his hospital treatment following the shooting. Medical testimony was adduced in the form of Dr. David Leighninger who had occasion to treat Hernandez for his gunshot wounds. Leighninger prescribed the methadone treatment referred to by Hernandez as part of the hospital recuperation. Leighninger testified on cross-examination that "methadone is a synthetic narcotic that is used in the drug abuse program as a substitute for other hard drugs, other hard narcotics." The following colloquy subsequently transpired as defense counsel continued his examination of Dr. Leighninger:

"Defense Counsel: And what is the hard narcotic that [Hernandez] was using?
Prosecutor: Objection.
The Court: Sustained.
Defense Counsel: Is it used as a heroin substitute?
Prosecutor: Objection to the form of the question.
The Court: Sustained."

■■ There was no evidence of record that Hernandez was using or addicted to heroin at the times relevant to the instant case. To the contrary, the only evidence of record established that Hernandez was under a controlled methadone maintenance program at the time of the shooting. Absent an offer of proof that Hernandez was using heroin at that time, the attempted impeachment was improper. (*People v. Telio* (1971), 1 Ill. App. 3d 526, 275 N.E.2d 222.) However, defendant fully presented to the jury that Hernandez had been using methadone for a number of years prior to the shooting; that methadone is a drug of narcotic properties; and, that it is used as a substitute for "other hard drugs." The jury was able to assess the effect of this evidence in reaching a determination of Hernandez' credibility. See *People v. Franklin* (1974), 22 Ill. App. 3d 775, 317 N.E.2d 611.

Defendant also contends that the trial court erred in precluding defendant from cross-examining Hernandez regarding certain threats allegedly made by Hernandez against defendant in the presence of one Michael Russell. Such threats do not appear to have been communicated by Russell to defendant. Russell was not called upon to testify at defendant's trial.

█ It is apparent that defendant attempted to introduce evidence concerning this particular threat to demonstrate its effect upon defendant's state of mind. Where the accused claims self-defense, and threats of the victim were known to the accused, these threats are admissible to prove the accused's apprehension of danger and its reasonableness. (See McCormick, Evidence §295, at 700 (2d ed. 1972).) The record in the instant case fails to establish that the threat at issue was communicated to defendant and, hence, it was not relevant to the purpose for which defendant sought to have it introduced.

██ Defendant's suggestion on appeal that he sought to introduce this threat as evidence of the deceased's animus toward defendant must fail inasmuch as defendant failed to lay the necessary foundation for the introduction of such evidence. Such evidence and prior threats or misconduct by the decedent directed toward defendant are admissible in a prosecution of defendant for killing decedent where the defendant relies upon self-defense and preliminary testimony establishes an act of aggression by the decedent. (*People v. Hill* (1968), 97 Ill. App. 2d 385, 240 N.E.2d 373.) Defendant endeavored to adduce testimony regarding this threat during his cross-examination of Anthony Hernandez. The trial court properly sustained the State's objection to this line of questioning as it was beyond the scope of direct examination. Further, the defense had not attempted to show via preliminary testimony that the deceased was the assailant in the fatal altercation as necessitated by the rationale and holding of *Hill*. In his case-in-chief, defendant properly established evidence tending to show that Hernandez had threatened defendant's life prior to the shooting. The jury was fully apprised in this regard.

Defendant finally contends that the trial court abused its discretion in unduly extending the scope of the prosecution's cross-examination of defense witness Janet Wagner.

Defendant asserts that during its cross-examination, the prosecution was permitted to question Wagner so as to "insinuate" that Wagner was told by defendant to attempt to locate Hernandez shortly before the shootings; that she knew that defendant intended to kill Hernandez; that she was arrested in connection with the shootings. Defendant contends that such lines of inquiry were improper inasmuch as there was no factual basis for the insinuations to be inferred therefrom. *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353.

Review of the record, however, establishes that Wagner testified that she telephoned defendant on the day of the shooting to advise defendant that Hernandez intended to slay defendant; that Wagner visited Ganci who was then armed with a pistol; that she and two companions left Ganci, acquired a sawed-off shotgun and drove to the "R" Lounge; that she and her companions met defendant and Kellas behind the lounge; that defendant and Kellas then left in Kellas' automobile while two other individuals left in yet another vehicle; that both cars contained weapons; and, that Wagner proceeded to walk on Devon Avenue, heard shots and saw the victims prostrate in the street. Wagner also admitted that she gave a statement to police after the shootings. This statement apparently contained a phrase indicating that defendant and Kellas "were talking about taking their shit away, that they didn't care if Wright and Hernandez got killed."

■■ Such testimony would provide an ample basis for the majority of the prosecution's cross-examination. While there was no basis for the assumption that Wagner was arrested in connection with the shootings, neither was there an objection to the question. Wagner testified that she was not arrested and no further issue was raised in this regard. Error, if any occurred by this line of inquiry, did not generate any substantial prejudice.

Defendant also argues that the trial court erred in permitting the State to adduce evidence that Ganci, Kellas and other of their acquaintances were members of the "T.J.O." Defendant asserts that this reference served to advise the jury that defendant and his companions were members of a street gang and that such group references were irrelevant to the issues in the case at bar.

.■■ We note at the outset that the trial court was careful to exclude all references to the "T.J.O." as a street gang. Testimony was adduced to establish, at most, that Ganci, Kellas and their companions were members of a formal group of young men and women who are residents of the Edgewater Community. Defendant's group membership was material to the charge of conspiracy to commit murder and relevant to show an agreement to commit an offense. (Ill. Rev. Stat. 1973, ch. 38, par. 8—2.) *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840.

■■ In any case, the error allegedly committed was harmless beyond a reasonable doubt. Even assuming that the jury improperly inferred that defendant belonged to an unsavory group and that such membership was not germane to the issues at trial, such evidence pales into insignificance when compared to the testimony properly adduced that defendant and his companions joined together as a heavily armed "task force" to seek out Hernandez and "clear up" their problems. Nor may the uncontradicted testimony of the various eyewitnesses simply be ignored. Such evidence

establishes that the victims were unarmed, retreating, and had their "hands up" when initially shot by defendant and that defendant thereafter fired additional rounds into his prostrate victims. Such evidence was sufficient to establish defendant's guilt beyond all reasonable doubt.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING, P. J., and PERLIN, J., concur.