THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSEPH CLAY *et al.*, Defendants-Appellants.

First District (5th Division)   No. 82—578

Opinion filed May 4, 1984.

Steven Clark and Elizabeth Clarke, both of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Kip R. Owen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a simultaneous trial, defendants Heard and Clay were convicted by separate juries of murder, attempted armed robbery, and conspiracy to commit armed robbery. After a finding by the trial court that the convictions for attempted armed robbery merged with the convictions for murder, Heard was sentenced to concurrent terms of 40 years for murder and 15 years for conspiracy; and Clay was sentenced to concurrent terms of 80 years for murder and 30 years for conspiracy. On appeal, Heard contends that (1) the trial court erred in denying his motion for substitution of judge without a hearing; (2) his inculpatory statement should have been suppressed because it was given during an involuntary detainment, in violation of *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248; (3) he was denied a fair trial by improper prosecutorial remarks during closing argument; and (4) his sentences are excessive. Defendant Clay's sole contention on appeal is that his sentences are excessive.

The charges arose from the fatal shooting of 10-year-old Laura Bruce on December 3, 1980, and as there is no contention that guilt was not established, we will set forth only the testimony relevant to the issues presented.

Prior to trial, counsel for defendant Heard made an oral motion for a substitution of judge, which was denied. He also made a pretrial motion to suppress all statements on the basis that they were co-

erced. At the hearing thereon, Heard testified that he was asleep at about 6 or 7 a.m. on December 7, 1980, when three police officers came to his home, knocked on his door, and after being allowed inside by his mother, told him to get dressed and come with them to the police station. They did not tell him that he was under arrest, nor did he believe that he was. He did not accompany them voluntarily, but only because he "didn't want to make any trouble." Once at the police station, he was placed in a small room and handcuffed; he was given coffee, but nothing to eat. Several officers whose names he did not know talked to him, but he told them that he had no information about the shooting of Laura Bruce and that he wanted to see an attorney; however, they continued to question him and accused him of lying. At about 6 p.m. that evening, he told Officer Keane that he knew nothing about the crime, but he agreed to go with Keane to help him locate certain people. After about an hour they returned, and he was put back into the same room—which was then locked—and he remained there for the balance of the night. He was never told that he was under arrest nor was he ever advised of his constitutional rights. Neither was he told that he was free to leave, and he did not do so because he was handcuffed. On at least two occasions, the police threatened him by telling him that he "better tell the truth." He stated that he gave a statement to an assistant State's Attorney only because he was told he "had to talk" and, although he signed the statement and initialed each page, he was never given the opportunity to read it. In the statement, he admitted that he had not been threatened; that he had been advised of his constitutional rights; and that he was given food, coffee, and cigarettes.

Officer Stachula testified that about noon on December 7, shortly after Heard was brought to the station, he spoke to him in the interview room. He advised him of his *Miranda* rights and questioned him about the homicide, but Heard denied being involved therein. He then informed Heard that the investigation and accounts of other witnesses contradicted his denial. He never specifically told Heard that he was free to leave, but neither was Heard handcuffed or placed under arrest.

Detective Keane testified that when he first saw Heard, at about 4:30 p.m. on December 7, he was neither handcuffed nor otherwise restrained. He advised Heard of his rights, told him that he was investigating the December 3 homicide of Laura Bruce, and questioned him about his involvement therein. When Heard said he needed time to think about it, Keane advised him to knock on the door if he needed anything and left, locking the door behind him. At 6 p.m., af-

ter receiving the *Miranda* warnings, Heard made a statement concerning his participation in the crime and agreed to go with Keane to locate the other offenders. When they returned to the station about three hours later, Heard, who was then under arrest, was put back into the interview room for the remainder of the night.

Assistant State's Attorney Dorfman testified that he spoke to Heard at 11:20 a.m. and again at 8:20 p.m. on December 8 and advised him of his rights prior to each conversation. Shortly after 9 p.m., Heard gave a court reporter statement in which he gave essentially the same information as he had in the two earlier interviews that day. Prior to making the court reporter statement, Heard told Dorfman that he had not been mistreated by the police. The motion to suppress was denied.

After the juries were selected, Heard made a separate motion to quash his arrest and suppress evidence. At the hearing thereon, Heard testified that when the police came to his home, they told him to get up and come with them. He objected, but one of the officers followed him into the bathroom while he dressed. Once at the police station, he asked several times why he was being held, but he was "just told to sit there." He was never informed that he was free to leave, and although the police had told him he was not under arrest, he thought he was. On cross-examination, he admitted testifying at the prior hearing that he did not think he was under arrest when he left the apartment with the police, and that the police said he was not under arrest.

Eunice Heard, defendant's mother, testified that when the police knocked on her door at about 6 or 7 a.m., she opened it slightly and three officers pushed their way in. At their request, she awakened her son and, as one accompanied him to the bathroom, the other searched her washing machine. The police never produced a search warrant nor did they tell defendant he was not required to go with them.

Sergeant O'Connor testified that on the basis of information that a witness had seen a car similar to defendant's at the scene of the crime and that defendant was known to frequent that area, he and two other officers went to Heard's apartment at about 10 a.m. on December 7. They knocked on the door, and when Heard's mother opened it they stated who they were and asked her to awaken him. When she did, they identified themselves and told him that a vehicle similar to the one he owned, which was parked in front of Heard's building, had been seen leaving the location of a murder on December 3. He then asked Heard if he would come to the police station to an-

swer some questions. Heard got up, went to another room to dress, and then voluntarily accompanied them to Area 6 headquarters, where he was taken to an interview room which was left unlocked. He was not handcuffed nor placed under arrest at that time. The motion to quash the arrest and suppress evidence was denied.

At trial, Detective Keane testified that he separately interviewed defendants Clay and Heard on the evening of December 7, 1980, and that after being advised of their constitutional rights, both voluntarily made statements concerning the crime—with each stating in substance that in late November 1980, Clay met with Gregory Johnson (Johnson) and Joseph Carter (Carter) at Clay's apartment building at 810 West Bradley and discussed robbing someone. During the conversation, Christine Bruce—the victim's mother, who was Clay's landlady—passed by and a discussion was held concerning when and how she collected the rent for the 40-unit building. On December 1, the men were joined by Heard in Clay's apartment again to discuss whom they might rob. Clay suggested that Mrs. Bruce would be an "easy mark" because she and her family lived alone in the apartment directly below his. On December 3, Johnson, Carter, and an unidentified third man went to Heard's apartment to tell him that they were going ahead with the planned robbery of Mrs. Bruce. At that time, Johnson was carrying a sawed-off shotgun. The group drove in two cars to Clay's apartment building, where Clay allowed them to enter through the buzzer security system. Heard said that he remained in his car while the others went inside, but after waiting for about 1½ hours, he went up the back stairway to find out how long the others expected to be. He then returned to his car, and about 10 minutes later upon hearing a shot, he quickly drove away. Clay, however, said that Heard was in the apartment prior to the shooting. Clay also stated that they had all agreed that Johnson and Carter would go downstairs to the landlady's apartment to commit the robbery; that Heard and the unidentified man would stand at her back door as lookouts; that Clay, who could be identified by the landlady, would remain in his apartment; and that the five men would split the robbery proceeds equally.

The testimony of Christine Bruce and her husband, William Hallars, disclosed the following: Mrs. Bruce was the building manager for the apartment complex, and she collected rents totaling as much as $7,500 to $8,000 between the first and fifth of each month. On December 3, 1980, their daughters, Laura, 10, and Serena, 9, arrived home from school at about 3:15 p.m. Laura was sitting on a chair in the living room, waiting for her sister to get dressed to go outside to play, when there was a knock on the door. Mrs. Bruce opened the

door and saw two men she did not recognize. She twice asked them what they wanted, but they did not respond. When she noticed that one had a shotgun, she began screaming. Hallars got up from the couch, but before he could shut the door the man fired the gun. Hallars told his wife to go to the kitchen and call the police, but as she and Serena entered the kitchen she noticed the back door opening and two shadows outside. She screamed again, whereupon Hallars entered the room, threw himself against the door, and locked it. He then called the police and reported that his daughter had been shot. Officer Calabrese testified that when he entered the apartment, he saw Laura lying on the floor in the living room with shotgun wounds in her chest and neck.

Officer Grogman testified that in his search for witnesses to the shooting, he spoke to Clay who told him that he had been in his apartment when he heard a gunshot, and when he ran to the stairwell to investigate, he saw two men running from the front door of the apartment below. He gave a description of the men which was later determined to be false. Also present in Clay's apartment was a woman named Delores Whittaker, who told Grogman that she had seen two men in the rear of the apartment below, and about a week later she identified a police photograph of Heard as one of those men. Grogman spoke to Clay again on December 5, and on the basis of the information he received from him, a decision was made to question Heard about the crime.

A deputy medical examiner testified that Laura Bruce died of a massive shotgun wound to the chest.

OPINION

We first consider defendant Heard's contention that his motion for a judge substitution was improperly denied without a hearing thereon. Section 114—5(a) of the Code of Criminal Procedure allows an automatic substitution of judge if, within 10 days after the cause has been placed on the trial call of the judge, defendant files a written motion alleging that the judge is so prejudiced against him that he cannot receive a fair trial. (Ill. Rev. Stat. 1981, ch. 38, par. 114—5(a); see *People v. Samples* (1982), 107 Ill. App. 3d 523, 437 N.E.2d 1232.) In addition, section 114—5(c) provides that a motion for substitution of judge for cause, supported by affidavit, may be filed by a defendant at any time, and that a hearing thereon should be conducted by a judge other than the one named therein. Ill. Rev. Stat. 1981, ch. 38, par. 114—5(c).

While defendant apparently concedes that his written motion for

substitution of judge was not in compliance with the requirements of section 114—5(a), he does assert that pursuant to section 114—5(c) he was entitled to a hearing on his allegation that he could not receive a fair trial because the trial judge, having presided over the trial of a co-offender, was familiar with and had a hostile predilection toward the evidentiary matters to be presented at his trial. While it is true that section 114—5 is to be construed liberally (*People v. Hanson* (1983), 120 Ill. App. 3d 84, 457 N.E.2d 1048), the right to substitution is not absolute (*People v. Robinson* (1974), 18 Ill. App. 3d 804, 310 N.E.2d 652), and in order to avail himself thereof, a defendant must comply with the applicable statutory provisions (*People v. Ganci* (1978), 57 Ill. App. 3d 234, 372 N.E.2d 1077)—one of which, as noted above, is that under section 114—5(c) a motion for substitution for cause must be supported by affidavit (*People v. Rice* (1982), 108 Ill. App. 3d 344, 438 N.E.2d 1333).

■ Here, defendant's motion was merely a conclusionary allegation, unsupported by affidavit, that the trial judge was prejudiced against him. Furthermore, our review of the record reveals that when the motion was first presented, the trial judge expressed his willingness to entertain it if it were accompanied by an appropriate affidavit, but counsel apparently chose to stand on the motion as presented. Having failed to bring his motion into compliance with the statute, defendant cannot now complain that he was entitled to a hearing thereon. The motion for substitution of judge was properly denied.

■ Defendant Heard next contends that he was involuntarily detained in an interrogation room in a police station for nine hours in violation of *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, and his resulting statement should therefore have been suppressed. In *Dunaway*, defendant made a confession after he was involuntarily taken into custody by police officers who, having no probable cause to arrest, had been ordered to pick him up and bring him in for questioning. Although he was not formally placed under arrest, evidence at trial disclosed that he would have been physically restrained had he attempted to leave. The United States Supreme Court held that such seizures are reasonable only if supported by probable cause and that, absent probable cause, a custodial detention and interrogation which exceeds the limited investigatory stop held valid in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, constitutes a violation of the defendant's constitutional protection against unreasonable search and seizure, and that any statements obtained as a result of such a seizure must be suppressed unless it can be demonstrated that there were sufficient intervening circumstances

which purged the taint of the illegal arrest. It is the State's position that defendant voluntarily went to the police station and was not under arrest during the preliminary questioning.

Initially, we note that two of the essential elements in the definition of an arrest are the intent of the officers and the understanding of the arrestee. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) Although no formal declaration of arrest is necessary for one to occur, the absence of such a declaration as well as the absence of other routine procedures associated with an arrest—such as handcuffing, fingerprinting, and photographing—are factors to be considered in determining the officers' intent (*People v. Gale* (1979), 72 Ill. App. 3d 23, 390 N.E.2d 921), and in examining the understanding of the defendant, the test is not what he actually, or subjectively, thought but what a reasonable man, innocent of any crime, would have believed given the same circumstances (*People v. Miller* (1980), 89 Ill. App. 3d 973, 412 N.E.2d 175). Moreover, where a trial court has conducted an evidentiary hearing on a motion to suppress, its ruling will not be disturbed unless it is manifestly erroneous (*People v. Reynolds* (1981), 101 Ill. App. 3d 576, 428 N.E.2d 694) and, when examining the propriety of such a ruling, a reviewing court may consider any evidence adduced at trial which supports the trial court's finding (*People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121).

Here, at the hearing on the motion to suppress statements, defendant testified that when the officers came to his home, he agreed to accompany them to the police station for questioning, albeit for the sole purpose of not wanting to cause trouble with the police, and that he did not believe he was under arrest at that time but said that at the station he was handcuffed, placed in a locked room, threatened, and repeatedly questioned without being advised of his constitutional rights. However, at the hearing on the motion to quash his arrest, he stated that he did object to the officers' demands that he come with them, and that from the outset he believed that he was under arrest, even though the police told him he was not. Several police officers testified that it was not their intention to place Heard under arrest when they came to his home; that he did not object to their request that he accompany them for questioning, but that if he had they would have left the premises without taking further action until consulting with the assistant State's Attorney; that they displayed no weapons and did not search, handcuff, or restrain him in any manner; that he was not photographed or placed in a lineup; that the door of the interview room was left open, and defendant was free to go; and that he was advised of his constitutional rights prior to any question-

ing. The assistant State's Attorney also testified that Heard voiced no complaints when asked about his treatment by the police. It is the function of the trial court to determine the credibility of witnesses and the weight to be given their testimony, and where the evidence is merely contradictory, a court of review will not substitute its judgment for that of the trier of fact. (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) We believe *Dunaway* is inapposite, as we find support for the trial court's finding that defendant voluntarily agreed to accompany the police to the station for questioning, and considering the evidence in its totality, we cannot say that the denial of defendant's motion was manifestly erroneous. See *People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979.

■ Defendant Heard further contends that certain comments by the prosecutor in closing and rebuttal arguments denied him a fair trial. He argues that the prosecutor improperly referred to facts not in evidence and interjected his personal opinion concerning the strength of the defense.

Although a prosecutor is permitted wide latitude in closing arguments (*People v. Belton* (1982), 105 Ill. App. 3d 10, 433 N.E.2d 1119), his comments therein must be based upon evidence admitted at trial or on reasonable inferences therefrom (*People v. Wallace* (1981), 100 Ill. App. 3d 424, 426 N.E.2d 1017) and may not include personal opinions as to the guilt of, or the sufficiency of the evidence presented by, defendant (*People v. Rowe* (1983), 115 Ill. App. 3d 322, 450 N.E.2d 804). However, such remarks do not generally warrant reversal unless they result in substantial prejudice to defendant (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200); *i.e.*, that they were such a material factor in defendant's conviction that the jury would likely have reached a contrary verdict had they not been made (*People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68). Furthermore, defendant may not assert such prejudice where the comments of which he complains were provoked or invited by the arguments of his counsel. *People v. Smith* (1982), 111 Ill. App. 3d 895, 444 N.E.2d 801.

Defendant first complains of a reference by the prosecutor in rebuttal argument to evidence contained in a police report concerning two figures allegedly seen by Mrs. Bruce at the back door of her apartment after the shooting. He maintains that because the police reports were not in evidence, reference to them was improper. Initially, we note that in his closing argument, defense counsel referred to the police report on at least four occasions, and at one point was even admonished by the trial court when he began reading from it. Consequently, the prosecutor's rebuttal remark that the police report did in-

deed contain information which defense counsel had previously asserted it did not, was invited by defense counsel's argument. Moreover, we see no prejudice here, where defendant's objection to the reference was sustained and because it would have been cumulative to the testimony of Mrs. Bruce that two figures were at her back door.

■ Defendant also argues that the prosecutor improperly expressed his personal opinion of the strength and credibility of the defense case by variously referring to it as "the biggest bunch of double-talk I've ever heard in my life," and "a ridiculous bunch of crap," and by prefacing other remarks with "I don't know why he's even trying to sell you that," and "It's hard for me to believe ***." It is improper for the prosecutor to interject his personal opinions as to the evidence; however, in the light of the overwhelming evidence of guilt presented here, we do not believe that these remarks could have materially affected the outcome of the trial. It also should be noted that while we agree that the use of some word other than "crap" would better suit the dignity of the court, since no objection was made to it and because it appears in all the standard dictionaries, we attach no particular significance to its effect on the jury here.

Defendant also challenges the prosecutor's comment that "[t]his happens all the time, guys who plan armed robberies and someone gets killed and they try to escape responsibility ***." The record reveals that the court sustained defense counsel's objection to "[t]his happens all the time," noting that no evidence had been presented thereon. Furthermore, the court properly instructed the jury to disregard any arguments by counsel which were not based on the evidence. Thus, we believe that any prejudice which might have resulted from the challenged remark was cured by the trial court's actions.

■ Defendant's final argument in this regard concerns the prosecutor's description of him as a "coward" and a "liar." We note that because defense counsel failed to object to either of these remarks, any error is considered waived unless we find that they resulted in substantial prejudice to defendant. (See *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174.) Moreover, in view of defense counsel's reference to his client as a "chicken" and because there were conflicting statements by defendant concerning the circumstances of his arrest, we find that the remarks did not constitute reversible error. See *People v. Owens* (1984), 102 Ill. 2d 88.

In summary, we do not believe that the challenged remarks were completely unsupported by the evidence, nor do we believe that the evidence was so closely balanced that even were we to find them improper, the comments could be said to have been so prejudicial as to

have been a material factor in defendant's conviction or to have denied him a fair trial. See *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.

■ Defendants Heard and Clay both contend that their respective sentences were grossly disparate from that of alleged accomplice Leroy Carter and were, therefore, excessive. It appears that in return for his testimony at the trial of Gregory Johnson who was the gunman in this shooting, Carter was charged with only attempted armed robbery and, after pleading guilty thereto, was sentenced to a term of 10 years. Defendants here argue that aside from Johnson, Carter was the most culpable offender because, in addition to participating in the planning of the aborted robbery, he was also present at the shooting and was the only one of them who might have been able to prevent it.

While it is true that similarly situated codefendants should not receive disparate treatment in sentencing (*People v. Gleckler* (1980), 82 Ill. 2d 145, 411 N.E.2d 849), we note that the issue of disparity generally arises only when the sentences are imposed for the same offense (*People v. Hill* (1978), 65 Ill. App. 3d 879, 382 N.E.2d 881). In *Hill*, defendant was convicted of murder and robbery and was sentenced to concurrent terms of 35 to 100 years and $6\frac{2}{3}$ to 20 years, respectively, while an accomplice who pleaded to burglary and thereafter testified for the prosecution was sentenced to a term identical to that received by defendant on the robbery conviction. In rejecting defendant's argument that these sentences were unjustifiably disparate, the *Hill* court held that an assertion of disparity may not be grounded on a comparison between a sentence for murder and one for an offense other than murder. See also *People v. Parish* (1980), 82 Ill. App. 3d 1028, 403 N.E.2d 725.

■ However, Clay also contends that the trial court abused its discretion in imposing extended-term sentences of 80 years on his conviction for murder and 30 years on his conviction for conspiracy to commit armed robbery. Before reviewing the merits of this contention, it is appropriate to note here that although defendant Heard has not raised this issue on appeal, it appears on close examination of the transcript of the sentencing hearing that, contrary to his interpretation of the court's statements thereat, his sentence for murder was also intended to be an extended term, 40 years being not only the maximum sentence for murder under section 5—8—1(a)(1)(a) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)(a)), but also the minimum extended term under section 5—8—2(a)(1) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)(1)). We direct the parties' attention to the following statement made by the trial court when imposing sentences:

"His [Heard's] part, as far as this Court, is the most minimal of the whole case. However, the case was no question, a very brutal case. The conduct is where *they will qualify for the extended term*. However, his [Heard's] part was not as severe as some of the others, such as Johnson. Defendant Heard, based upon the background, I sentence you to 40 years. \*\*\*

Defendant Clay, the case would not have come off if it wasn't for him. Clay does have an extensive record, many sheets. [H]e is by far one of the worst I have ever seen \*\*\*. He knows the people. He sets up the rip-off. He lies to the police and afterward tries to cover up. \*\*\* He qualifies for the extended term. Therefore, I will sentence you to \*\*\* 80 years \*\*\*." (Emphasis added.)

Similarly, the 15-year sentence imposed upon Heard for conspiracy was both the maximum term for a Class 1 felony under section 5—8—1(a)(4) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(4)) and the minimum extended term therefor under section 5—8—2(a)(3) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)(3)). It seems apparent therefrom that the trial court first considered, as is required by section 5—8—2, the singular question of whether the offense warranted an extended term under section 5—5—3.2 (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2), and upon finding that it did, then considered the relative degree of each defendant's participation therein, as well as their individual criminal backgrounds in determining the severity of the sentences to be imposed. Moreover, we assume that the capable and experienced trial judge was aware that where the reprehensible conduct of two or more defendants convicted of the same offense is substantially the same, differing only in their relative degree of participation, the sentence of one to an extended term, and not the other, would be improper. (*People v. Earullo* (1983), 113 Ill. App. 3d 774, 447 N.E.2d 925.) Therefore, except where expressly noted, our findings in regard to the propriety of the imposition of extended terms apply equally to defendant Heard, notwithstanding his failure to raise this issue on appeal.

In this regard, we see that section 5—8—2(a) of the Unified Code of Corrections (the Code) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)) authorized the imposition of an extended sentence when either of the two factors in aggravation, as set forth in section 5—5—3.2(b) (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)) were found to be present:

"(1) When a defendant is convicted of any felony after having been previously convicted \*\*\* of the same or greater class fel-

ony, within 10 years \*\*\*; or, (2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty \*\*\*."

Because the factors are set forth in the disjunctive, the presence of either one (*People v. Grier* (1980), 90 Ill. App. 3d 840, 413 N.E.2d 1316) in a prosecution for murder increases the permissible sentence from a term of 20 to 40 years (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)(a)) to a term of 40 to 80 years (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)(1)).

■■ Clay first argues that the imposition of an extended-term sentence upon him as an accomplice is violative of the eighth amendment prohibition against cruel and unusual punishment. (U.S. Const., amend. VIII.) Citing no authority to support his position, he merely analogizes an extended sentence to the death penalty, which, under section 9-1(b)(6)(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)(a)) may be imposed only "if the murdered individual was actually killed by the defendant and not by another party to the crime \*\*\*." The State argues that in light of the extreme disparity between a sentence of death and an incarceration term of determinate duration, which allows credit for "good time" served and possible eventual parole, the penalties are incomparable.

It should be first noted that Clay raises this argument for the first time on appeal, and that the failure to present a constitutional issue to the trial court generally results in a waiver thereof for purposes of review. (*People v. Gomez* (1983), 120 Ill. App. 3d 545, 458 N.E.2d 565.) However, we will consider the argument and, in doing so, we note that the test for determining the constitutionality of a criminal penalty is whether it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. (*People v. Gomez; People v. Wright* (1974), 18 Ill. App. 3d 1028, 310 N.E.2d 494.) Because the legislature has limited the imposition of extended terms to situations where one or more specific aggravating factors are present, apparently determining that these factors enhance the seriousness of the offense, we find nothing which could be described as cruel, degrading, or shocking to the moral sense of the community in imposing a sentence which correspondingly enhances the penalty therefor.

Furthermore, as Clay correctly observes, the language of section 9—1(b)(6)(a) clearly evinces the legislature's intention to proscribe the imposition of the death penalty upon accomplices to a murder. Thus, in view of the purposeful inclusion of that language in section 9—

1(b)(6)(a), it is our view that had the legislature intended to similarly exclude accomplice-offenders from the purview of the extended-term statute, it would have inserted language to that effect. The absence of any qualifying language in section 5—5—3.2 leads us to the conclusion that no such proscription was intended. Moreover, we have consistently held that because the application of the extended-term statute is determined by the offense, not by the extent or nature of the offender's participation therein, the fact that a defendant is convicted under the theory of accountability or that his participation in the crime was less than that of his co-offenders does not preclude the imposition of an extended sentence upon him. *People v. Rogers* (1984), 122 Ill. App. 3d 384; *People v. Rowe* (1983), 115 Ill. App. 3d 322, 450 N.E.2d 804; *People v. Tibbs* (1981), 103 Ill. App. 3d 73, 430 N.E.2d 681; *People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150.

Clay next argues that the evidence does not support the trial court's finding that this crime was accompanied by brutal conduct indicative of wanton cruelty. Citing *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, he posits that there was sufficient evidence from which the court could have inferred that the shooting was an accident. In *Evans*, the unintended victim was killed when a stray bullet, fired by defendant at the intended victim after a heated verbal exchange, apparently ricocheted off the windshield of a car and struck him. In affirming the appellate court's finding that the offense was not heinous or brutal, the supreme court noted evidence adduced at trial that the intended victim was a reputedly violent person who frequently carried a gun, and that it was only after he threatened defendant and walked toward his car that defendant fired the shots— one of which was deflected by the car window—thus raising an inference that defendant was acting on the subjective, albeit unreasonable, belief that the man was going to get his gun and that his (defendant's) actions were necessary for self-defense. In the instant case, Clay has repeatedly stressed that he was not present at the shooting but, unlike *Evans*, he can point to no evidence to support his hypothesis that the killing was an accident. To the contrary, the testimony of the victim's father—that as he approached the doorway, but *before* he slammed the door, he saw the shotgun come up from the man's side and go off—belies defendant's suggestion that the shotgun may have discharged *when* the door was slammed on it. Further, the mere fact that the shooting occurred before any demand for money was made lends no support for defendant's accident theory; rather, it demonstrates that the victims in no way antagonized the offenders or provoked the shooting by resisting or by refusing to comply with their

robbery demands.

Clay further argues that the trial court failed to specify any particular aggravating factors, such as torture, terrorizing, or other unnecessary physical intrusions upon the victim (see *People v. Rogers* (1984), 122 Ill. App. 3d 384), to support its findings of brutality and wanton cruelty, positing therefrom that the conduct on which the court based those findings was nothing more than conduct inherent in the offense, *i.e.*, killing. We note, however, that the trial court is under no independent duty to delineate the factors upon which it based its finding of heinous conduct. (*People v. Davis* (1982), 93 Ill. 2d 155, 442 N.E.2d 855.) Moreover, our supreme court has also held that the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" does not require torture or unnecessary pain and, citing Webster's New Third World Dictionary, has stated that the general acceptation of "heinous" is "hatefully or shockingly evil," "grossly bad," or "enormously or flagrantly criminal"; and that the term "brutal" encompasses any conduct which is "grossly ruthless," "devoid of mercy or compassion," or "cruel or cold-blooded" (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344); thus, in determining whether a crime was committed in a heinous or brutal manner, trial courts have considered a variety of factors, including but not limited to the extent of the injury inflicted (*People v. Davis* (1984), 121 Ill. App. 3d 916), the degree of force used (*People v. Reese* (1984), 121 Ill. App. 3d 977; *People v. Tolliver* (1981), 98 Ill. App. 3d 116, 424 N.E.2d 44), the motivation of the offenders and the danger created by their actions (*People v. Hunter* (1981), 101 Ill. App. 3d 692, 428 N.E.2d 666), and the mental anguish inflicted on the victims (*People v. Jones* (1979), 73 Ill. App. 3d 99, 391 N.E.2d 767) as well as on their family (*People v. Clark* (1981), 102 Ill. App. 3d 414, 429 N.E.2d 1255; *People v. Schlemm* (1980), 82 Ill. App. 3d 639, 402 N.E.2d 810). In addition, we note that section 5—5—3.2(b) has been amended to provide that an extended sentence may be imposed when a defendant is convicted of a felony committed against a person under 12 years of age. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b)(3)(i)); *People v. Green* (1983), 118 Ill. App. 3d 227, 454 N.E.2d 792.) Although the statute applicable at the time of this offense did not include that provision, and thus the age of the victim here, standing alone, did not activate the application of the statute, it is our view that its subsequent inclusion as a factor which now justifies an extended term indicates that it has always been a relevant factor to be considered by the court in a finding thereof.

Thus, the factual situation in *People v. Davis* (1984), 121 Ill. App.

3d 916, to which defendant compares this case, is clearly distinguishable. However, the holding therein actually illustrates the proper reasoning to be applied in determining whether a crime is sufficiently brutal or heinous to warrant imposition of an extended sentence. In *Davis*, defendant's 50-year sentence for attempted murder was reduced to 30 years because the trial court improperly classified the offense as "heinous and brutal" solely on the basis of defendant's intent to kill the victim, intent being a legal element of the offense of attempted murder. In so ruling, however, the *Davis* court specifically noted the absence of any other aggravating factors in that the victim was shot with a .22-caliber handgun; that he sustained two relatively minor wounds which were described as non-life-threatening and which were treated without the administration of pain medication; and that he was able to return to his full-time police duties within one month. In the instant case, the evidence discloses that in planning the robbery, the offenders were not only aware that Mrs. Bruce had a family, but also considered them in determining that she would be an "easy mark." Notwithstanding her vulnerability, they agreed that the robbery would be more easily effectuated with the assistance of a weapon with which to "scare her," deciding that a loaded, sawed-off shotgun, which they knew or should have known would inflict fatal—or at least serious— injuries if fired, would accomplish that purpose. In accordance with their plan, Clay, who had supplied all of the necessary background information regarding the victims, their habits, and the layout of their apartment, and had allowed the others access to the building, remained in his apartment foregoing physical participation in the crime only because he knew he would be recognized by the victims, who were his neighbors, while two other offenders went downstairs to confront the victims in their home. Upon seeing that one of the men to whom she had opened her door was brandishing a shotgun, Mrs. Bruce began screaming; whereupon Hallars, in an effort to protect his family, attempted to bar the men from entering. Apparently realizing that their robbery plans were being thwarted, Johnson then fired the shotgun, killing the couple's 10-year-old daughter. Furthermore, although Heard maintains that he took no part in this crime—stating that his role was only to act as a lookout in the alley behind the victim's apartment and that he fled immediately upon hearing the shotgun blast—Mrs. Bruce testified that after the shooting, when she ran into the kitchen with her other daughter to call the police, she saw the back door opening and was able to discern two figures outside who, it appears from the record, could only have been Heard and the unnamed fifth participant.

■ Considering the premeditated plan to commit this robbery; the agreement of the participants to use one of the most deadly weapons available to effectuate it; their knowledge that young children lived in the apartment and that the victims would be surprised, unarmed, and defenseless; the terror to which the family was subjected in standing helplessly against an unexplained invasion of their home and in seeing their 10-year-old daughter shot by an unprovoked shotgun blast, which according to the medical examiner had caused a wound so large as to allow him to see inside the chest cavity, and in thereafter being subject to further fear as other assailants attempted to enter the rear door of the apartment just after the shooting, we see no abuse of discretion in the trial court's finding that this crime was accompanied by exceptionally brutal conduct indicative of wanton cruelty.

■ Nevertheless, although defendant Clay's criminal history is considerably more extensive and his participation in the planning of the robbery was ostensibly greater than that of Heard, it is our judgment that his 80-year sentence is excessively disparate from the 40-year term imposed on Heard, whose conduct was likewise reprehensible—differing only in the extent of participation. (See *People v. Earullo* (1983), 113 Ill. App. 3d 774, 447 N.E.2d 925.) Accordingly, we believe the sentence of defendant Clay for murder should be reduced from 80 years to 60 years.

■ Moreover, notwithstanding the State's concession that the sentences imposed on the convictions for conspiracy to commit armed robbery exceeded the range permissible for a Class 4 felony (Ill. Rev. Stat. 1979, ch. 38, par. 8—2(c); Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(7)) and therefore must be reduced, we further note that the Code authorizes the imposition of an extended term only "for the class of the most serious offense" of which defendant was convicted (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a); *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520). Although we are aware that this court has issued conflicting opinions regarding the interpretation of the statute as it applies to the permissibility of multiple extended-term sentences (see *People v. Mims* (1982), 111 Ill. App. 3d 814, 444 N.E.2d 684; *People v. Brown* (1982), 104 Ill. App. 3d 1110, 433 N.E.2d 1081; *People v. DeSimone* (1982), 108 Ill. App. 3d 1015, 439 N.E.2d 1311; but see *People v. Green* (1983), 118 Ill. App. 3d 227, 454 N.E.2d 792; *People v. Rowe* (1983), 115 Ill. App. 3d 322, 450 N.E.2d 804; *People v. Walsh* (1981), 101 Ill. App. 3d 1146, 428 N.E.2d 937)—and we are cognizant that this question currently awaits resolution by our supreme court—it is our belief that until such time as that court

makes a contrary pronouncement thereon, we are controlled by its holding in *Evans* under which the imposition of an extended-term sentence upon Clay for conspiracy to commit armed robbery is improper.

Therefore, we reduce the sentence of defendant Heard for conspiracy from an extended term of 15 years to a term of three years—the maximum permitted for the offense—and find that defendant Clay's 30-year extended sentence for conspiracy must likewise be reduced to three years.

Summarizing, we affirm the convictions of defendants for both offenses; we affirm the extended sentence of 40 years imposed on Heard for murder, but we reduce his sentence for conspiracy to commit armed robbery from 15 years to three years; and we reduce the sentences of Clay from 80 years to 60 years on his conviction for murder and from 30 years to three years on his conviction for conspiracy to commit armed robbery.

Affirmed as modified.

LORENZ and O'CONNOR, JJ., concur.